SOUTHERN PAC. CO. v. BERKSHIRE.
(No. 891.)

(Court of Civil Appeals of Texas. El Paso. Dec. 5, 1918. Rehearing Denied Jan. 2, 1919.)

1. NEGLIGENCE ⊂⇒9 — UNINTENTIONAL INJURY.

Negligence is essential to liability for unintentional injury.

2. MASTER AND SERVANT ⊂⇒286(15)—INJURIES TO SERVANT — FEDERAL EMPLOYERS' LIABILITY ACT — NEGLIGENCE — QUESTION FOR JURY.

Whether railroad was negligent in maintaining a mail crane near its track, according to postal regulations, against which the engineer struck his head while looking out of his cab, *held* for the jury.

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

3. MASTER AND SERVANT ⟐204(1)—FEDER-
AL EMPLOYERS' LIABILITY ACT — ASSUMP-
TION OF RISK.

The federal Employers' Liability Act (U.
S. Comp. St. 1916, §§ 8657–8665) leaves the
application of assumed risk as it was at com-
mon law, as recognized and construed by the
federal courts.

4. MASTER AND SERVANT ⟐288(2)—FEDER-
AL EMPLOYERS' LIABILITY ACT — ASSUMP-
TION OF RISK—QUESTION FOR JURY—MAIL
CRANE.

In an action by a railroad engineer engaged
in interstate commerce for injuries occasioned
by being struck by a mail crane while leaning
out of his cab, whether plaintiff assumed the
risk *held* for the jury.

Appeal from District Court, El Paso Coun-
ty, P. R. Price, Judge.

Action by W. S. Berkshire, temporary ad-
ministrator and personal representative of
the estate of William A. Linder, deceased,
against the Southern Pacific Company.
Judgment for plaintiff, and defendant ap-
peals. Affirmed.

Beall, Kemp & Nagle, of El Paso, for ap-
pellant.

Geo. E. Wallace and W. S. Berkshire, both
of El Paso, for appellee.

WALTHALL, J.  W. S. Berkshire, appellee,
plaintiff in the court below, brought this
suit as temporary administrator and person-
al representative of the estate of William A.
Linder, deceased, against appellant, for the
use and benefit of the surviving wife and
children of the said William A. Linder, de-
ceased.  William A. Linder was employed
by, appellant as locomotive engineer, run-
ning between El Paso, Tex., and Lordsburg,
N. M., and while running and operating an
engine attached to one of appellant's trains,
between said points, at Carney, N. M., de-
ceased was struck by a mail crane and was
thereby injured so as to cause his death
shortly thereafter.

Appellee alleged negligence on the part of
appellant in placing .and maintaining the
mail crane or such portion of same in such
close proximity to the railroad track and
engine as not to be reasonably safe for the
engineer in his position on the engine, in the
ordinary performance of his duties, and in
such close proximity to the railroad track
and engine as to strike deceased while oc-
cupying his usual and customary position on
the engine, and thereby causing injuries
from which he died.

Appellant answered by general demurrer,
general denial, by plea that deceased, Linder,
met his death while in the employment of
appellant and while engaged in interstate
commerce, and that Linder's death was due
to risks and dangers assumed by him, for
which appellant was not liable.

A trial before a jury resulted in a verdict
in favor of appellee in the sum of $15,000,
apportioned to the surviving wife and chil-
dren.

Appellant presents six assignments of er-
ror as grounds for reversal.  The first three
assignments are based on the refusal of the
court to give appellant's special charge to re-
turn a verdict in favor of appellant.

The record shows that, at the time of the
accident resulting in the death of Linder,
he was engaged in operating an engine and
train then engaged in interstate commerce.
Such being the fact, the federal Employers'
Liability Act (Act April 22, 1908, c. 149, 35
Stat. 65 [U. S. Comp. St. 1916, §§ 8657–8665])
applies; the doctrine of assumed risk as con-
strued and applied under that act controls,
and it is the contention of appellant under
its several propositions, both of fact and of
law, that Linder, while operating his engine
at the time he was injured, assumed all the
risks and dangers incident to his employ-
ment as engineer on said train, and the in-
jury which he received resulting in his
death was the result of such risks, and the
court should have given the peremptory
charge requested.  It is appellant's conten-
tion under its fourth assignment that the
court was in error in submitting to the jury
any issue of negligence because, as claimed,
there was no evidence of negligence on the
part of appellant proximately causing the
injury to Linder.  The fifth and sixth assign-
ments claim error in submitting any issue
of assumed risk, because, as claimed, Linder
assumed all the risks ordinarily incident to
operating the engine under the facts and
circumstances shown to exist at that time;
that, there being no negligence on the part
of appellant shown, the risks assumed did
not grow out of negligence on the part of ap-
pellant.

It is appellee's contention that the court
was not in error in refusing to give the re-
quested peremptory charge in favor of ap-
pellant, for the reason that the evidence call-
ed for the submission of the issues, and that
it was the province of the jury to determine
them.  There is but little, if any, controversy
in the evidence.  The facts pleaded and the
uncontradicted evidence show the following:

At the time William A. Linder was injur-
ed, appellant was engaged in the business of
interstate carrier by railroad for hire over
its line of railroad extending from El Paso,
Tex., westward through the states of New
Mexico, Arizona, and into the state of Cali-
fornia.  Over its lines of railroad it operat-
ed both passenger and freight trains.  The
place or station Carney, at which the injury
to Linder occurred, is a station (called in
the evidence a blind siding) in New Mexico,
between El Paso, Tex., and Deming, N. M.
At the time Linder received his injuries, he

was an employé of appellant as locomotive engineer and was operating an engine pulling a passenger train carrying soldiers on appellant's road and was going west from El Paso, Tex., to Deming, N. M. The appellant did not maintain an office or agent at Carney. At Carney the United States mail was taken by appellant's mail trains from mail cranes placed near the side of the railroad track. At a point before reaching Carney, it was noticed that "the main driving pin on the engine was running hot." There was light, dim smoke on the engineer's side from the driving pin. It run hotter and hotter to about a mile from Carney, when Linder stepped out of the cab through the front window on the running board, got on his hands and knees to see whether the pin was getting hotter. Afterwards Linder returned to his seat in the engine cab. Just then the mail sack from the mail crane at Carney fell, and it was immediately discovered that Linder was sitting on the engineer's seat in the engine cab in an unconscious condition, his right arm, head, and part of his body outside of the cab, leaning with the right side and arm over the arm rest of the storm or side window of the engine. The head train brakeman was at the rear end of the engine cab looking back and down the train with his left side from 10 to 18 inches out beyond the side of the engine tank and cab, and, while in that position, either the mail crane or the mail sack (witness did not know which) knocked his hat from the left to the right side, and he was hit on the side of the face with blood from Linder. Linder had a cut on the right side above and about one inch over the right ear. While no one saw the mail crane strike Linder, the evidence justifies the finding that Linder received the injury causing his death by being struck on the head by the arm of the mail crane. Linder was injured at 9:15 o'clock on the morning of the 3d day of July, 1916. The day was clear, and on a clear day a man could sit on the engineer's cab seat and look through the front window of the cab or could lean out of the storm or side window of the cab and see the mail crane a half mile away, and could see the crane and mail pouch 500 yards away. At the time Linder was injured, the train was going on an average of 35 miles an hour. If Linder wanted to look at the driving pin through the side window, he would have to lean out fully 14 and possibly as much as 19 inches beyond the side of the cab, to see it. At the time Linder was injured, he had been running on both passenger and freight trains between El Paso and Deming over a period of several years, had made many trips over that portion of appellant's road and by the station Carney, making 156 trips past Carney during the six months next preceding the time of the accident, during all of which time said mail crane was there, and was similarly located as on the day of the accident, and some of the passenger trains on which Linder was engineer took up the mail in passing from the mail crane at Carney. There were several other mail cranes at other stations on appellant's line between El Paso and Deming and having approximately the same relative position with reference to the cab and the track as the one at Carney. There is a standard distance all of the cranes are placed from the side of the car and are made so by post office regulations. The post office department does not require the railroad companies carrying the mail to put up the cranes. They can either stop the train and pick up the mail, or put up the crane and take the mail therefrom. Where the cranes are used, the company is required to erect them and according to post office department regulations. While there was no direct evidence to the effect that Linder knew of the mail crane at Carney, without stating the evidence, it justifies the finding that Linder knew that a mail crane was maintained and used at Carney and knew its general location with reference to the side of the engine cab, but had nothing to do with its maintenance, location, or use. The train on which Linder was riding at the time of his injury was not the mail train. The mail train was to follow shortly thereafter, and the mail pouch was hung on the arm of the mail crane by the postmaster at Carney for the mail train following and from 15 to 20 minutes before the mail train's time at Carney. In placing the mail pouch on the crane, the postmaster acts under the orders of the post office department.

There is no complaint as to the verbiage of the court's charge in submitting the issues of negligence and assumed risk. The contention is that there is no evidence of any negligence on the part of appellant in placing or maintaining the mail crane in its position at Carney, and that, if there was negligence in placing and maintaining the crane in its position, the undisputed evidence shows that the position of the crane with reference to the engine was obvious and known to Linder, or which he must necessarily have known in the discharge of his duties as engineer; that the injury to Linder grew out of and was the result of risk ordinarily incident to his employment; that, under the undisputed evidence of his knowledge of the presence and position of the crane, Linder, while operating the engine in interstate commerce, assumed all risks and dangers incident to the negligence of appellant; that where the proof was vague, indefinite, and uncertain as to the distance between the mail crane and the side of the engine, the evidence was insufficient to submit to the jury any issue of negligence or assumed risk, and the court should have instructed the verdict for appellant.

The court instructed the jury on the issue

of negligence that, if they found "the position of the mail crane was so near to the track as not to be reasonably safe for an engineer in his cab in the ordinary performance of his duty, and the defendant was guilty of negligence in so constructing and maintaining said crane in such close proximity to the track, if said crane was in such proximity to the track as not to be reasonably safe, and that such negligence, if any, was the proximate cause of the death of William A. Linder, then your verdict will be for the plaintiff," unless they should find for defendant on other issues.

On the issue of assumed risk, the court charged that, if the jury found "the proximate cause of the death of the said William A. Linder was from the ordinary risks and dangers incident to his employment, or that, prior to the happening of the accident, deceased, William A. Linder, knew of the position of the crane which is alleged was so constructed and the location thereof, or that in the ordinary discharge of his duties must necessarily have known of same, and that he appreciated the danger thereof, then, and in such event you so find, you are instructed that he assumed the risks, and your verdict will be for the defendant."

Appellant refers us to many cases, both state and federal, in support of its propositions.

[1] Negligence is essential to liability for unintentional injury. While the issue of negligence is a fact to be determined by the jury, to justify its submission, the evidence must show, under the charge given, that the position of the mail crane was placed so near the railroad track as not to be reasonably safe for Linder in his cab while in the ordinary performance of his duties as engineer. The evidence does not give us a standard of distance from the side of the cab at which the crane could be placed, and be reasonably safe for the engineer. It does not give us a proximate standard of distance from the side of the engine within which an engineer would ordinarily perform his duties in operating his engine, and otherwise keep a lookout for a proper handling and movement of the engine. While, no doubt, the only available evidence as to what Linder was doing, and just how far he was reaching out from the side of the cab at the time he was struck by the crane, was offered on the trial, to establish the fact that at the time Linder came in contact with the crane he was then in the ordinary performance of some one of his duties and that in its performance he did not reach out beyond what would ordinarily be considered a reasonably safe distance, at which the mail crane could be put, is more or less a matter of surmise. The question presented is: Was the evidence offered and the attendant facts and circumstances shown, and to which we may look, sufficient to take the case to the jury? The evidence shows be-

yond question, we think, that at the time Linder was injured he had just re-entered his cab from a trip of inspection of his engine and had discovered that the main driving pin on the engine was running hot and was getting hotter and hotter. The condition of the driving pin was noticeable. It began about a mile out from Carney, but it was not then known whether it was on the engineer's side of the engine, or on the fireman's side. A light dim smoke from the hot driving pin was discovered on the engineer's side. At the moment Linder returned to his seat on the cab, the front brakeman was standing in the gangway between the engine and the tank, with his hands on both grabirons looking out down the side of the train, trying to discover a "hot box." He testified:

"Just then this mail sack fell. At the time it fell, either the crane or the sack knocked my hat from the left to the right side, and I got this drop of blood on my face. * * * I should judge that at that time my head was out about 14 inches from the side of the engine tank and cab. * * * My head was out from 10 to 14 inches. I can't judge exactly myself. It would have to extend that far in order to see down the side of the train. My whole body was in the cab. At the time my hat was struck, I felt the blood and noticed the sack going down at the same time, and the blood hit me on the side of my face. When I turned around to Mr. Linder, he had a cut on the right side, above the ear, about an inch over the right ear, to my knowledge. I shut the throttle off and started applying the brakes. The fireman was on the side where he belonged, setting the injector. The first thing that attracted my attention to the accident was noticing the sack, after it struck my hat. After the sack fell, I reached up and felt the blood. There was some on my glove, also. That wasn't blood I lost. It didn't scratch me, just struck my hat. I don't see how I could have extended out over 14 inches. * * * I suppose I could have swung out a foot and a half. I was looking back. I know it struck him. No, I didn't see it strike him, and I wasn't looking in that direction at the time. * * * I hadn't been looking in Mr. Linder's direction for two minutes, or about that length of time. * * * This crane stands on the same basis as any other; it is like all the balance of them. I never measured the distance it was from the track, but I should judge 14 inches from the parallel part of the cab—4 inches from the arm rest and 9 or 10 inches to the point of the crane—may be more or less, but 14 inches from the parallel part of the cab to the crane. The cab window and the coach line behind are supposed to be parallel. Linder had to have his head partly out of the cab window to be struck. In order to get in position, to get in his seat, I would judge he would have to be in that position. It don't take much to get 14 inches out, but certainly, for anything to hit it, it would have to be out 14 inches. * * * That is just an estimate. It may be 15, 18, or 19; I don't know. * * * At the time of the accident, the train was going on an average of 35 miles an hour. If the engineer wanted to look at the driving pin through this

window, he would have to lean out 14 inches, anyway, to see it."

Section 1355 of the Postal Regulations, introduced in evidence, provides:

"At all points at which trains do not stop where the postoffice department deems the exchange of mails necessary, a device for the receipt and delivery of mails satisfactory to the department must be created and maintained."

Witness Matthews testified, in part:

"There was a crane erected and maintained at Carney in conformity with this section of the postal regulations. As to the distance of the cranes from the track, I have reasons for knowing that this particular one, and the general line of them, are within the requirements of the government, because the government has made objections to the setting of cranes on this division, and we have had to reset them to meet the requirements. The railroad furnishes the equipment for the mail cars, subject to the specifications of the postal department. The cranes and the entire equipment are subject to meeting the specifications of the postal department, and the entire equipment is made in conformity therewith."

Witness Neeley testified, in part:

"I am in the railway mail service. My run is from here to Tucson. There are a great many stations known as 'catch stations' where we catch pouches hung for us. The crane, I believe, is the stand where they hang the pouches, and we have a hook in the car door to catch them with. The crane is a post, or upright, by the side of the track, built and put there for that purpose."

After describing the way the device works, in taking the mail pouch from the crane, the witness said:

"I haven't seen any cars but what the hook extended out about 29 inches from the side of the car. * * * You couldn't catch a mail pouch with this hook over 29 inches. Anything within 29 you could. * * * Outside of the rocking of the train you could catch it at 29 inches. As to whether you could catch it with absolute safety at 25 inches would depend on the rocking of the train. If it rocked more than four inches, you couldn't. * * * Naturally there is a standard distance all the cranes are from the side of the car. They are all the same distance exactly and are made so by post office regulations. The same hook which will take a sack off a crane in Arizona and New Mexico will take it as it goes through Western Kansas. The post office doesn't require the railroad to put up the cranes. They can either stop the train and pick up the mail, or put up the crane. It is optional with the railroad which they do. But I understand that, if they do erect them and use the hook, they do it according to government regulations."

[2] We think it sufficiently appears from the facts shown that Linder's injury was caused by his coming in contact with the arm of the mail crane, and that at the time of his injury he was then at his place on the cab of his engine, looking out of the side or storm window and in the direction of the driving pin on the engine; his head extending at least 14 inches beyond the side of the cab. The jury could well conclude from the evidence that the arm of the mail crane or the mail pouch that struck the brakeman's hat struck Linder. The jury could also conclude from the evidence that the point of the arm of the mail crane extended to within 14 inches of the side of the cab. The mail pouch could be reached and taken by the hook, the other portion of the device, at any distance between 25 and 29 inches. The erection of the crane was shown to be for the convenience of the appellant. While the evidence is meager, we think the jury could well conclude from it that all that was essential to a proper use of the mail device was that the mail pouch, when placed on the arm of the crane, should be at such distance from the passing train that the end of the hook or catcher bar would extend beyond it, and, from the evidence of the witness Neeley, the railway mail agent on that division of the road, it is established that the device could be so placed and used and the mail pouch taken at a distance of 29 inches from the side of the train. The evidence shows that the side of the engine is flush with the side of the coaches. True, the witness Matthews testified that the crane at Carney was erected and maintained in conformity with the postal regulations. But his statement is more a conclusion than the statement of a fact. The postal regulation introduced does not state the distance the crane must be from the track or coaches, nor does the evidence of any of the witnesses show the distance the postal regulations require the arm of the crane to be from the track or coaches, nor is there any evidence in the record, other than that of the brakeman, Anderson, as to the distance of the arm of the crane from the side of the cab. But if it should be held that the evidence was sufficient to show that the crane was placed at whatever distance the postal regulations require, still that fact alone would not have the effect to exclude other evidence on the issue of negligence and establish the fact that the crane was placed at a reasonably safe distance from the engine; but the question of negligence, it being a question of negligence vel non, would still be open for the jury to determine from all the evidence. We have reached the conclusion that the evidence was sufficient on the issue of negligence to take the case to the jury. Judge Williams, in speaking for the Supreme Court in M., K. & T. Ry. Co. v. Williams, 103 Tex. 228, 125 S. W. 881, in a somewhat similar case, on one of the issues of negligence in that case, said:

"The occurrence itself is sufficiently indicative of negligence on defendant's part to call for an explanation from it, freeing it from such an imputation. The killing of one of its employés, while in the proper performance of his duty, by

contact with a structure of its own contrivance near the track, strongly indicates a lack of proper care and foresight in the location of the structure, in view of the reasonable presumption that it could have been made consistent with the safety of employés while rendering the ordinary service."

.,The evidence does not show the actual distance the point of the arm of the crane was from the side of the cab, nor does it show approximately the distance an engineer would ordinarily reach out from the side of the cab in the ordinary performance of his duties. The jury could well have concluded from the evidence that Linder was out from the cab not exceeding about 14 inches, when the hook or other part of the device could have taken the mail from the crane at as much as 29 inches.

[3, 4] The other question presented is: Did Linder assume the risk? At the time of the accident, Linder and the engine and train he was operating were engaged in interstate commerce. This being true, the federal Employers' Liability Act applies, and that act leaves the application of assumed risk as it was at common law, as recognized and construed by the federal courts. What seems to us to be a clear statement of the doctrine of assumed risk is made by the Supreme Court of the United States in the case of Gila Valley, G. & N. Ry. Co. v. Hall, 232 U. S. 101, 34 Sup. Ct. 229, 58 L. Ed. 524. In that case, the court said:

. "An employé assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employé has a right to assume that his employer has exercised proper care with respect to providing a safe place of work * * * and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employé becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employé with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear, not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety; or else such danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it."

To the same effect is Seaboard Air Line Railway Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1068, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

· It has often been stated, both by federal and state courts, that, in order to charge an employé with assumption of risk attributable to the employer's negligence, it must appear that the employé not only knew of the defect or unsafe condition of the place where he was to perform his service, but that he knew it endangered his safety. In T. & P. Ry. Co.

v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382, Swearingen said he knew that he had to pass the scale box at the time he was hurt, but that he was not then thinking about it and did not see it when he passed it going after the cars; that there was nothing to hide the scale box from his view; it was open and apparent. He said he knew the location of the scale box before he was hurt. Judge Maxey in that case instructed the jury that the mere fact that Swearingen knew of the existence and location of the scale box would not, as a matter of law, charge him with the knowledge of the danger, if such danger was there, due to the proximity of the north, rail to track 2, and whether he knew of the danger was a question of fact for the jury to determine in connection with all the facts and circumstances in evidence. The proof was that the distance at which the scale box was put from track 2 was standard and considered a safe and proper distance in putting in scales where the tracks are standard gauge apart; that the tracks in the yards were standard gauge apart; and that the scales had been erected a number of years prior to the happening of the accident, and after tracks 1 and 2 were built. We refer to the case for further statement of the facts. In passing upon the case, Mr. Justice White, for the Supreme Court, said:

"The record shows that there was evidence tending to establish that the track scale box was not erected in a reasonably safe place, and that, although the plaintiff knew that the scale box was situated adjacent to track No. 2, he did not know that it was so near that it could not be passed, in the performance of his duties as a switchman, without danger."

The court held in that case that, prima facie, the location of the scales where the tracks were only the standard distance apart, and, under the facts stated, did not incontestably establish the performance by the company of the duty imposed upon it to use due care to provide a reasonably safe place for the use of the switchmen in its employ, and that it was therefore properly a question for the jury to determine whether or not the scales were maintained in a reasonably safe place, and, if not, whether Swearingen had notice thereof. It seems to us in this case, as held by both the Court of Appeals and the Supreme Court in the Swearingen Case, that the dangerous contiguity of the arm of the mail crane and the extra hazard to Linder resulting therefrom was not so open and obvious on other than a close inspection, as to justify taking from the jury the determination of the question whether there had been an assumption of the risk. Linder was entitled to assume that the company had used due care to place the mail crane at a reasonably safe distance from the side of the engine for the performance by him of his duty in looking after the proper running of his engine. The fact that the company might

not have performed such duty in respect to the erection and maintenance of the mail crane at Carney was not so patent as not to be readily observable. The trial court or this court cannot declare as a matter of law, arising from the evidence, that Linder had assumed the hazard incident to the actual situation. The fact that Linder had often passed the mail crane in operating his engine over that part of the road, and that was the extent to which the evidence goes, might clearly establish the fact that he knew of the use of the crane in the train mail service and of its position with reference to side of the engine; but it being a device separate and apart from his engine and something with which he had nothing to do in the operation of his engine, except on a few occasions to slow up the train at that point to enable the mail clerk on the train, by use of the device, to take the pouch from the arm of the crane, there is nothing in the evidence to show that his attention was ever called to the distance the arm of the crane, when elevated, would be from the engine, or that, when elevated, the crane could not be passed without danger to him, when in the discharge of any duty necessary to be performed in the proper care and handling of his engine. It might be remarked, in this connection, as said by the court in Railway v. Williams, supra, that the mere adoption of such a device for handling the mails would imply that its proper use would not endanger employés so engaged on passing trains, and that a collision would not likely happen when proper care is used to make it safe. We are of the opinion that the court was not in error in any of the matters pointed out in the assignments.

The case is affirmed.